## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jeff LeBaron,                                                   Civil No. 05-1822 (DWF/SRN)

            Plaintiff,

v.                                                                      **MEMORANDUM**
                                                                            **OPINION AND ORDER**

Speedway SuperAmerica LLC,
d/b/a SUPERAMERICA,

            Defendant.

---

Sheila Kay Ketelsen Dokken, Esq. and Lori C. Peterson, Esq., Peterson Law Office, counsel for Plaintiff.

Marko J. Mrkonich, Esq. and Stephanie D. Sarantopoulos, Esq., Littler Mendelson, PC, counsel for Defendant.

---

## Introduction

       Plaintiff Jeff LeBaron brought this action against his former employer, Defendant Speedway SuperAmerica LLC ("SSA" or "the Company"), after SSA terminated LeBaron's employment. In his Amended Complaint ("the Complaint"), LeBaron asserts five causes of action: (1) violation of Minnesota's Whistleblower Protection Act, Minn. Stat. § 181.932 (2006); (2) retaliation/reprisal in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.15 (2006); (3) defamation; (4) negligent retention and supervision of employees; and (5) retaliation in violation of Title VII of the

Civil Rights Act of 1964.[1]  This case is before the Court pursuant to SSA's Motion for Summary Judgment.  For the reasons set forth below, the Court grants in part and denies in part the motion.

## Background

SSA operates gasoline and convenience stores in Minnesota and other midwestern states.  SSA hired LeBaron in October 2002 as a manager trainee.  In January 2003, SAA promoted LeBaron to store manager.  LeBaron received positive performance reviews and regularly received pay raises throughout his employment.  In fact, in February 2004, LeBaron was 1 of 15 store managers out of more than 300 stores selected to receive an award recognizing his outstanding performance as a store manager.

**LeBaron's Complaints of Alleged Discrimination**

From May 2004 through May 2005, LeBaron reported to District Manager Julie Wasley.  LeBaron's retaliation claims stem from a complaint of alleged discriminatory conduct that LeBaron made on Sepember 14, 2004.  On that date, LeBaron sent a letter to Wasley in which he objected to comments that Wasley made regarding Darla Dubois, an associate manager that Wasley transferred to LeBaron's store.[2]  In that letter, LeBaron stated that Wasley complained that DuBois was a lesbian and alleged that Wasley said

---

[1]     LeBaron voluntarily dismissed Counts I and IV in his opposition brief.  (Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Opp'n Mem.") at 2.)

[2]     Wasley denies having any conversation with LeBaron about Dubois and contends that she did not receive LeBaron's September 14 letter complaining about the alleged
(Footnote Continued on Next Page)

"[DuBois] likes women, and that's sick." (Aff. of Sheila Dokken ("Dokken Aff."), ¶ 7, Ex. 6.) LeBaron also stated that Wasley told him that Dubois "has a work comp claim for a back injury[.]" (*Id.*) Further, LeBaron stated that Wasley told him that "[Dubois] is not the kind of employee SAA wants" and instructed him to document anything that Dubois does outside of her restrictions so that Wasley could terminate Dubois' employment. (*Id.*) LeBaron stated to Wasley that her comments regarding Dubois were "discriminatory and unprofessional." (*Id.*) Finally, LeBaron stated that he "simply cannot participate in any act of discrimination or harassment of employees[.]" (*Id.*)

Two days after LeBaron sent the letter, Wasley and co-District Manager Mark Erickson visited LeBaron at work and told him it was not in the "best interest" of his career to keep writing letters. (Aff. of Stephanie D. Sarantopoulos ("Sarantopoulos Aff."), Dep. of Jeff LeBaron ("LeBaron Dep.") at 97.) LeBaron understood the visit and comment as a disciplinary action and threat to his job. Two weeks later, on September 30, 2004, LeBaron wrote a letter to Wasley, expressing concerns about inconsistent policies and procedures, which he had previously raised in a letter dated May 17, 2004. Then on October 21, 2004, LeBaron contends that he suffered chest pains from work-related stress and went to the emergency room for treatment.

A few months later, in January 2005, Wasley gave LeBaron a positive performance evaluation, expressing that he was "one of the best managers in the district"

---

(Footnote Continued From Previous Page)
conversation until after SAA terminated LeBaron's employment.

and recommended that he apply for a district manager or trainer position.  (LeBaron Dep. at Ex. 34.)  About two months later, on March 18, 2005, LeBaron wrote a letter to Gene Freeman, employed at SAA's corporate office, in which he requested that other SAA employees be denied access to certain emails that contained private information.  About two weeks after he sent that letter, on March 28, 2005, Wasley told LeBaron not to contact SAA's corporate office with his concerns and instead instructed him to follow the chain of command.  Wasley also told LeBaron that he failed to provide his associate and assistant managers with appropriate passcodes while he was away from the store on vacation in March 2005.  As a result, Wasley contends that these managers were unable to access the store homepage and check voicemail.

   After this meeting, LeBaron again developed severe chest pains, allegedly caused by stress related to his interactions with Wasley.  The next day, LeBaron began a medical leave.  LeBaron returned from medical leave on April 12, 2005.  Upon his return, Wasley asked LeBaron to report to a Burnsville store, instead of his regular Apple Valley store.  LeBaron worked at the Burnsville store for four days prior to and during the regular manager's vacation.  LeBaron claims that placing him in the Burnsville store before the manager of that store went on vacation was an act of retaliation for his complaints.

   LeBaron documented this allegation of retaliation and generally complained that Wasley was treating him unfairly in a letter to Wasley dated April 26, 2005.  Specifically, LeBaron alleged that Wasley was "harassing [him] by moving [him] from store to store, keeping [him] from management meetings, purposely short staffing [him] and removing

4

all support management to make [his] job more difficult[.]" (Dokken Aff., Ex. 10.) On May 1, 2005, LeBaron began reporting to District Manager Chris Renz. Although Wasley no longer supervised LeBaron, the next day LeBaron wrote Wasley contesting an April 28, 2005 documentation in which Wasley asserted that LeBaron failed to abide by SSA's policy by failing to contact her before notifying SAA's corporate office of his recent need for medical leave. LeBaron alleged that Wasley documented him in retaliation for his having raised concerns about policies and procedures and for complaining about discrimination and harassment.

On May 4, 2005, LeBaron called SAA's ethics hotline and reported Wasley's alleged unethical behavior. The person taking LeBaron's telephone call later wrote that LeBaron reported that Wasley "[c]oaches store management on discrimination issues – if employee has work comp claim, if employee is pregnant, over weight, homosexual or is not good looking, DM coaches SM on getting rid (termination) [sic] these employees." (Dokken Aff., Ex. 12.) In response to LeBaron's call, SAA Human Resources Representative Karen Dover contacted LeBaron and requested copies of the letters LeBaron had written to Wasley.

On May 12, 2005, LeBaron met with Regional Manager Carol Scheckel to discuss his concerns about Wasley and the fact that SAA had not taken any action on his complaints. LeBaron repeated his concerns regarding alleged inconsistent application of Company policy and procedure and his belief that Wasley made discriminatory remarks and retaliated against him for reporting such discrimination by placing a written notice in

5

his file on April 28, 2005.  Scheckel requested copies of the letters LeBaron had written to Wasley and promised to look into the matter.  On this same date, LeBaron wrote Christa Powers, SAA Human Resources Division Manager, and stated that he was offended by an email that another SAA manager sent to Wasley that contained "sexual overtones" and was signed "Love, Jeffy."  (Dokken Aff., Ex. 13; LeBaron Aff., ¶ 14.)  LeBaron provided copies of his letters to Dover, Scheckel, and others.

**SAA Terminates LeBaron's Employment**

On June 8, 2005, Renz received notice from corporate headquarters that perpetrators had committed MoneyGram wire transfer scams in SAA's Minnesota stores.  At 12:50 p.m. Renz forwarded a voicemail message to every store manager within his district warning them of fraudulent activity occurring in the area.  LeBaron, who was working on June 8, checked his voicemail that morning and then left for the day at 2:00 p.m.  LeBaron then began a vacation that was scheduled from June 9 through June 12, 2005.

On June 9, despite being on vacation, LeBaron went to the Apple Valley store to perform work necessary for the processing of payroll accounts.  He did not check voicemail while at the store or thereafter during his vacation.  LeBaron explained that his subordinate manager was in charge while he was gone, possessed the passcodes to check voicemail, and was responsible for checking voicemail.  That afternoon, Renz distributed a second voicemail at 3:50 p.m. warning stores about the thefts occurring in the area.

On June 10, 2005, LeBaron called into work to leave a message for Renz regarding

a work-related issue. Later that day, while Assistant Manager Barbara George and employee Jessica Schweim were on duty, an individual telephoned, claiming that he was a technician for MoneyGram. The individual, who was actually perpetrating a MoneyGram scam, claimed that he was a training technician with MoneyGram and instructed George and Schweim to assist him with testing by entering specified amounts of money. Believing the calls to be legitimate, George and Schweim agreed and facilitated the alleged "test" wire transfers. As a result, the individual stole approximately $10,000 from the Apple Valley store.

Thereafter, Renz met with LeBaron to discuss why LeBaron's staff did not receive the warnings regarding the MoneyGram scams. LeBaron responded that George was responsible for checking voicemail while he was on vacation. LeBaron explained that he always provides his associate and assistant managers with his passcodes when he is on vacation. He explained that he had provided George with his passcodes in March 2005, before he went on vacation and took medical leave. He explained that while he was absent in March and April, his staff responded to all of his voicemails and emails. LeBaron also stated that Wasley had told him "she did not want her manager's involving themselves with work while on vacation, including listening to voice mails" and that he had not been instructed otherwise since Renz became his supervisor. (LeBaron Dep., Ex. 28.) Wasley also testified that associate managers accept responsibility for what happens in a store when the store manager is on vacation.

On June 13, 2005, Renz and Powers terminated LeBaron's employment with SAA

7

for "failing to follow supervisory instructions and for failing to fulfill his responsibility as Store Manager to provide his employees with important information, which caused the Apple Valley store to incur a $10,000 loss." (Def.'s Mem. of Law in Supp. of Summ. J. ("Def.'s Mem.") at 15.) LeBaron's store was the only store to sustain a loss due to the scam in Minnesota after the Company issued warnings of the threat, and LeBaron was the only manager fired in connection with losses SAA sustained as a result of the MoneyGram scam. LeBaron objected to his discharge and disputed SAA's conclusion that he failed to follow his supervisor's instructions. Following his employment termination, LeBaron initiated this lawsuit. SAA now moves for summary judgment.

## Discussion

**I.     Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences, which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record, which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Retaliation

In Counts II and V, LeBaron alleges claims of retaliation in violation of the MHRA and Title VII. Specifically, LeBaron contends that SAA terminated his employment in retaliation for the complaints he filed against Wasley. The retaliation provision of Title VII makes it unlawful for an employer to retaliate against an employee because that employee "opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Courts analyze the MHRA, which contains similar prohibitions, under Title VII principles. *See LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 691 (8th Cir. 2001) (applying same standards to Title VII and MHRA retaliation claims).

The parties agree that the Court must analyze LeBaron's claims under the burden-shifting framework established in *McDonnell Douglas* because LeBaron has not proffered direct evidence of retaliation. Under that framework, LeBaron must establish a

9

prima facie case of retaliation by showing (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *Shanklin v. Fitzgerald*, 397 F.3d 596, 603 (8th Cir. 2005). SAA then may rebut LeBaron's prima facie case by advancing a legitimate, non-retaliatory reason for the adverse action it took against LeBaron. *Id.* If SAA makes this showing, LeBaron must demonstrate that SAA's proffered reason was a pretext for illegal retaliation. *Id.* at 603–04.

The Court first addresses whether LeBaron has established a prima facie case of retaliation. SAA does not refute that LeBaron's termination constitutes an adverse employment action; rather, SAA asserts that LeBaron has failed to satisfy the first and third elements required to state a prima facie case of retaliation. Regarding the first element, SAA essentially argues that LeBaron did not engage in protected activity because he did not have a reasonable good faith basis for alleging discriminatory conduct in his complaints. Regarding the third element, SAA argues that LeBaron cannot establish any causal connection between his complaints to or about Wasley and his termination because he first complained to Wasley in September 2004—almost nine months before SAA terminated his employment.

The Court rejects SAA's assertions and finds that a jury could conclude that LeBaron has demonstrated the required elements to establish a prima facie case of retaliation. First, a jury could find that LeBaron's complaints of alleged discrimination in

the September 14 letter and thereafter constitute statutorily protected conduct.[3]  In particular, LeBaron contends that he believed Wasley's comments regarding DuBois' sexuality and workers compensation claim were discriminatory and objected to Wasley's alleged instruction that he retaliate against DuBois on these bases.  LeBaron also contends that he believed Wasley's treatment of pregnant employees and single mothers was discriminatory.  The Court rejects SAA's contention that LeBaron's complaints do not constitute protected conduct because Wasley never acted on her comments regarding Dubois.  Additionally, the Court rejects SAA's contention that Wasley would not discriminate against lesbians because she, a bisexual, is attracted to women herself.  Wasley's sexual orientation and whether she acted on her discriminatory comments are irrelevant to whether LeBaron engaged in protected conduct.

Second, a jury could find that LeBaron has established a causal connection between his complaints of alleged discrimination in the September 14 letter and thereafter and the termination of his employment.  LeBaron's primary evidence of SAA's allegedly retaliatory conduct is the temporal proximity of his filing of his complaint to Dover and his termination.  Although LeBaron first complained to Wasley in writing in September 2004 regarding her alleged discrimination, he reiterated these complaints to upper

---

[3]     As the Court stated at oral argument, much of what LeBaron complained about does not constitute protected conduct.  In particular, LeBaron's complaints about the implementation of certain company policies and procedures and the allegedly sexually indiscrete email from an unidentified manager to Wasley that was signed "Love Jeffy" do not constitute protected conduct.

(Footnote Continued on Next Page)

management beginning in the spring of 2005.  Specifically, LeBaron met with Scheckel on May 12, 2005, spoke with Dover several times thereafter, and finally sent Dover a letter on May 29, 2005, only two weeks before SAA terminated his employment.  A jury could find that LeBaron has established causation based on the timing of his termination coupled with the evidence that LeBaron was the only manager fired in connection with the losses SAA sustained as a result of the MoneyGram scam.  Thus, viewing the evidence in the light most favorable to LeBaron, the Court finds that genuine issues of material fact exist regarding whether LeBaron has sustained his burden of establishing a prima facie case of retaliation.

   Next, the Court addresses whether SAA has rebutted LeBaron's prima facie case by advancing a legitimate, non-retaliatory reason for terminating LeBaron's employment.  Here, SAA asserts that it terminated LeBaron's employment for misconduct.  Specifically, SAA contends that it terminated LeBaron's employment because of his "failure to follow his supervisor's instruction to keep apprised of important company information and to provide his staff with the ability to access that information in his absence, causing a $10,000 loss at the store."  (Def.'s Mem. at 26.)  The Court finds that LeBaron's alleged misconduct constitutes a non-retaliatory business reason for terminating LeBaron's employment.

      Finally, the Court addresses whether LeBaron has demonstrated that SAA's

---

(Footnote Continued From Previous Page)

proffered reason was a pretext for illegal retaliation.  The Court rejects SAA's contention that LeBaron was responsible for the financial loss because he failed to check his voicemail while on vacation and therefore failed to receive voicemail messages that would have prevented the scam.  Here, LeBaron testified that he was not required to check his voicemail while on vacation.  Instead, LeBaron testified that George was responsible for checking voicemail during LeBaron's vacation and that he had provided George with the passcodes to access the voicemail.  Further, LeBaron points out that SAA's job descriptions for assistant and associate managers state that these managers assume "management responsibilities during periods of Store manager's absence" including "when Manager is on vacation[.]"  (Dokken Aff., Exs. 20, 21.)  Viewing this evidence in the light most favorable to LeBaron, the Court finds that a genuine issue of material fact exists regarding whether LeBaron failed to follow company policy and was therefore responsible for the MoneyGram loss.

     Additionally, the Court rejects SAA's contention that Wasley's purported retaliatory animus could not and did not have any impact on LeBaron's termination because Wasley was not LeBaron's supervisor at the time of his termination.  Although Renz became LeBaron's supervisor approximately six weeks before SAA terminated LeBaron's employment, the Court nonetheless finds that a genuine issue of material fact exists regarding whether  the termination of LeBaron's employment for alleged misconduct was a pretext for illegal retaliation because LeBaron had lodged complaints about Wasley to numerous SAA employees.  Specifically, in May 2005, LeBaron called

the ethics hotline and contacted or met with Powers, Dover, and Scheckel. Thus, the Company dealt with LeBaron's complaints on a broad basis and SAA, rather than Renz, individually, was responsible for the termination.

In conclusion, viewing the evidence as it must, the Court finds that LeBaron has presented sufficient evidence of retaliation to survive summary judgment. Thus, the Court denies SAA's request to dismiss Counts II and V.

**III.    Defamation**

In Count III, LeBaron asserts claims of defamation. To establish that a statement is defamatory under Minnesota law, the plaintiff must demonstrate that the statement is false, was communicated to a third party, and tends to harm the plaintiff's reputation. *Bol v. Cole*, 561 N.W.2d 143, 146 (Minn. 1997). However, defamatory statements affecting the plaintiff in his "business, trade, profession, office or calling" are "slanders per se" and thus actionable without any proof of actual damages. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980). A true statement cannot be defamatory. *Id.* The First Amendment protects expressions of opinion not "sufficiently factual to be susceptible of being proved true or false." *Hunter v. Hartman*, 545 N.W.2d 699, 706 (Minn. Ct. App. 1996) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990)). Whether a statement can be proven false is a question of law. *Id.*

LeBaron's defamation claims are comprised of two sets of statements. The first set of statements is essentially comprised of allegations that LeBaron was incompetent. Specifically, LeBaron testified that, "[w]hile I was on medical leave the word throughout

the whole district amongst all the store managers was that I was incompetent enough not to run my own store[.]" (LeBaron Dep. at 278.)  LeBaron attributes the alleged defamatory comments to Wasley.  Specifically, LeBaron testified that, "[t]hese people [unnamed SAA employees] were telling me what was going on and [Wasley] was bad-mouthing me to these people telling them that I was incompetent."  (*Id.* at 278–79.)  The second set of statements is comprised of allegations that LeBaron has had to "self-publish" the reasons for his termination from SAA to potential new employers.  In particular, LeBaron contends that he has had to repeat the "false allegations that he was responsible for money losses from the Money[G]ram scam."  (Opp'n Mem. at 39.)  LeBaron "believes the false reasons for his termination have harmed his reputation and credibility."  (*Id.*)  Specifically, LeBaron attributes the fact that he has not yet been promoted to a full-fledged manager at his current job to the fact that he has had to publish the reasons for his termination.

   In response, SAA asserts that the first set of allegedly defamatory statements fail because LeBaron has not identified what exact words were used, to whom, and where the false statements were made.  Further, LeBaron contends that the claim fails because LeBaron relies on the hearsay of unidentified persons.  Additionally, regarding both of LeBaron's defamation claims, SAA contends that it had a qualified privilege for making the statements.  Furthermore, SAA contends that there is no evidence that it acted with actual malice.  Finally, SAA contends that LeBaron has failed to provide any factual evidence to support his assertions that his reputation in the community has been harmed.

The Court finds that LeBaron's first set of alleged defamatory statements fails because LeBaron has not pleaded the alleged defamatory statements with specificity. *Pinto v. Internationale Set, Inc.*, 650 F. Supp. 306, 309 (D. Minn. 1986) (holding that a claim for defamation must be pleaded with specificity). In particular, allegations that Wasley "bad-mouthed" LeBaron are too vague to support a defamation claim. Moreover, LeBaron fails to plead to whom, when, and where Wasley made these statements. *See Pinto*, 650 F. Supp. at 309 (dismissing defamation claim because plaintiffs "failed to allege who made the allegedly libelous statements, to whom they were made, and where."). Furthermore, these claims fail because LeBaron relies on the hearsay of unidentified SAA employees. *See Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993) ("Inadmissible hearsay evidence alone may not defeat a summary judgment motion."). Because LeBaron's allegation that Wasley said he was incompetent relies on hearsay and is the only proffered evidence supporting this claim, the Court must dismiss LeBaron's defamation claim as it relates to the statements of alleged incompetence.

Conversely, the Court finds that LeBaron's self-publication defamation claim survives summary judgment. Generally, no publication of an alleged defamatory statement exists where a defendant communicates a statement directly to a plaintiff, who then communicates it to a third person. *Lewis v. Equitable Life Assurance Soc'y of the United States*, 389 N.W.2d 876, 886 (Minn. 1986) (citing Restatement (Second) of Torts § 577, comment m (1977)). But the Minnesota Supreme Court has recognized an

exception to this general rule for compelled self-publication. *Id.* at 888. Under the doctrine of compelled self-publication, the originator of the defamatory statement is liable for damages caused by the statement "where the originator knows, or should know, of circumstances whereby the defamed person has no reasonable means of avoiding publication of the statement or avoiding the resulting damages[.]" *Id.* The doctrine should be "narrowly applied." *Id.* Here, SAA does not contest that LeBaron was compelled to repeat the allegedly defamatory statements to prospective employers and that a publication therefore existed. Rather, SAA contends that the statements were protected by a qualified privilege.

To be privileged, a statement "must be made in good faith and must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause." *Bol*, 561 N.W.2d at 149. "An employer's communication to an employee of the reason for discharge may present a proper occasion upon which to recognize a qualified privilege." *Lewis*, 389 N.W.2d at 890. Whether a communication is privileged is a question of law for the court to decide. *Id.* at 889–90. If the Court determines that the employer is entitled to a qualified privilege, the employee may still prevail by proving that the employer abused the privilege by acting with actual malice. *Id.* (citing *Stuempges*, 297 N.W.2d at 257). In order to show malice in the employer-employee situation, the plaintiff must demonstrate that the defendant "made the statement from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." *Id.* at 890–91 (citation omitted). Whether the employer abused the privilege is

a question of fact for the jury. *Id.* at 890.

Here, the parties agree that applying for jobs and informing prospective employers why SAA terminated LeBaron's employment provided LeBaron the proper occasion and motive to self-publish the allegedly defamatory statements. The Court finds that SAA had reasonable grounds to believe their statements, even though LeBaron disputes whether the events constitute cause for his employment termination. Having found that SAA had a qualified privilege, the Court next addresses whether SAA abused this privilege and should therefore lose it. Viewing the evidence in the light most favorable to LeBaron, as it must at this stage, the Court finds that the question of whether SAA acted with ill will or improper motives is a question of fact for the jury. Therefore, the Court denies SAA's motion for summary judgment on LeBaron's defamation claim as it relates to the self-published statements.

## Conclusion

The Court notes that a victory at summary judgment does not equate to a victory at trial. Although the Court finds that LeBaron's claims survive summary judgment, the Court wonders what damages, if any, LeBaron would be entitled to given his current employment as a store manager at Kwik Trip, Inc.

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.  Defendant SAA's Motion for Summary Judgment (Doc. No. 14) is **GRANTED in part** and **DENIED in part** as follows:

    a.  The Court denies summary judgment on Counts II, III (regarding self-published statements), and V.

    b.  The Court grants summary judgment on Counts I, III (regarding statements of incompetence), and IV.

    c.  Counts I and IV are **DISMISSED WITH PREJUDICE**.

Dated:  January 10, 2007         s/Donovan W. Frank
                                 DONOVAN W. FRANK
                                 Judge of United States District Court